Let's let the government retake its seat here. Thank you. Go right ahead. Good morning, Your Honors. The lead petitioner was a businessman in Bogota, Colombia. He imported clothing from the United States. He borrowed money from what we'd call a loan shark at an extortionate rate, 72 percent a year. The loan shark also sent him clients, customers, who coincidentally did not pay lead petitioner. Therefore, lead petitioner could not pay the money, the money lender, the loan shark. Lead petitioner received some visits from a, I think I can use it colloquial, rather scary character who harshly demanded payment. And, of course, lead petitioner couldn't make the payment because part of the scheme was to bankrupt him. Where's the – what's the protected ground? Well, the – for asylum or for cat? Start with asylum. For asylum, we compared him to the petitioners in the Dessier case, where that petitioner opposed a kleptocracy, wouldn't go along with government corruption. And we said that this petitioner is analogous because of the IJ's finding that the narco-traffickers who were behind this extortion scheme because they wanted to use his business for money laundering, they were really so intertwined with the government that they either were the government themselves or called a shadow government. By this particular individual, and anyone similarly situated, refusing to go along with this scheme, they were opposing the government. The political position of these narco-terrorists was to run the government of Colombia for the benefit of the narcotics traffickers. That appears to be fairly well documented. We've referred to that category as business people who wouldn't go along with the corruption. And it's briefed. I'll certainly answer any questions, but we haven't changed our position at all on that. Although, thus far, no one else has agreed with us on that part. And after he didn't make the payments, he was summoned to the office of, I guess we'd call him the big man in the operation, who said, I need to get paid right away, leave petitions, I don't have the money. And that's when they proposed that he allow them to use his business for their own purposes. He had a pretty good idea about what was going on. He spoke to other people who said, you're going to be killed either way. If you don't cooperate, they'll kill you. And if you do, they'll kill you, presumably because they wanted to get rid of any witnesses. And the record is, the I.J. made a finding that the record was replete with evidence that this, what happened to Lee Petitioner, was a common pattern of how the narco-terrorists with the government exploited people and granted him cat for that reason. And there were several interesting issues before this Court. I've already, I think, addressed our claim for asylum, and I would certainly answer any questions. But I want to use my time more to go on to the cat, because I think that's the more complex issue. And there's one regulation that nobody mentioned that really should be mentioned, because it is tangentially germane to this. And that is 8 CFR 1003.1, small d, 3.1. And that is, that governs the standard of review of the Board. And it says they don't reverse the factual findings of the immigration judge, unless they're clearly erroneous. There's only one reference in the Board's decision that even comes within that ambit, where they say they don't agree that the level of corruption had risen to the appropriate level. And I'd say that unless they find and can demonstrate that the I.J.'s finding was clearly erroneous, not supported by substantial evidence on the record, that should be disregarded. But what we're really talking about is their application of the acquiescence issue. That's really what it's about. It's not so much that they're rejecting carte blanche, the factual findings of the I.J. They appear to be saying even if it's all true, he doesn't meet the standard. And as we've said, and I don't want to beat it, like beat a dead horse, but we've said many times, they're still following their line of thinking, their holding in matter of S.V., which this Court has rejected very clearly in Zheng. They're saying it's not simply enough that the government is aware and didn't do anything. It requires something more, almost to the level of an act of participation in the torture. And in the Zheng case, this Court rejected that. What we have here is a situation where the evidence, which really cannot be refuted, shows the degree of narco-terrorist or narco-trafficking control of the government. And the evidence shows that what happened to Lead Petitioner was exactly how they operate and that the government of Columbia does not do anything. If they do anything, they turn such people over to the narco-terrorists. So there doesn't seem to be any basis at all for overturning the I.J.'s decision, other than the Board just doesn't like this circuit's holding on the acquiescence standard. Now, getting back to asylum very briefly, if the Court were to find that we were right on the asylum, on his membership in a group, he'd also, for what it's worth, he'd also be entitled to restriction on removal because the Board never rejected the notion that it was more likely than not that he faced torture. What they appear to be rejecting, because it was a long decision for the Board. It wasn't crystal clear by any means. They appear to be saying, but it doesn't fall within the guidelines of Catt. We believe it does, but the question then becomes for asylum, was it because of a protected ground? And if it's because of a protected ground that he feared persecution and it's more likely than not, he clearly qualifies for restriction. I'd like to spend a minute on jurisdiction because that was the subject of a motion. And having reviewed those issues more carefully, it does appear that there's no need to, there's no question but there was a final order, because unlike some of the other cases where the Board just reverses and says we're deporting this person, they actually, in reversing the grant of, in reversing the Catt, they gave him voluntary departure. And as we pointed out in our brief, that with regard to the second petitioner, his wife, that the Board just never ruled on her, so she has a valid grant of Catt. And I just want to save what few seconds I have to, few minutes I have to answer questions or for rebuttal. Well, the government says that there's no final order because the Board didn't have the authority to enter the order of removal. So how do we cure that? Well, they actually, the Board didn't enter an order of removal here. Are you talking about, the Board didn't enter any order with regard to the second respondent. With regard to the lead respondent, they entered an order granting him voluntary departure. And I know, I'm aware that the case law says they can't, they can't issue an order of removal, but I don't know if that would apply to an order of voluntary departure. But in any event, it's an interesting question, because they are, it is somewhat different to order somebody removed, to grant, to deny them all relief, and then to grant, but to grant them alternative relief. If this Court finds that the Board was simply wrong in reversing the grant of CAT or in denying asylum, that would probably solve the problem, because it would be remanded back to the Board, either most likely, I shouldn't speak for you, most likely remanded back to the Board with instructions to issue an order consistent with your decision. Well, what they're saying is we don't have jurisdiction because there's not a final order of removal. So I don't know. Well, there's clearly a final order of removal as to the second Petitioner, because she was not eligible for voluntary departure because she hadn't been here long enough. Well, I understand you, and she was granted CAT. And then in overturning the – they didn't address her at all. So we really can't say they overturned her. Her order remains what it was from the immigration judge, which is she has a grant of CAT. So with regard to the lead Respondent, the lead Petitioner, they're saying we're issuing a final order granting him voluntary departure. I had the impression that she was attailed to his whatever happened to him. Is that not right? Absolutely correct. She was – she was – I mean, although she talked briefly about her own family background, that was more to substantiate the well-founded fear. She was a derivative of his CAT claim. However – and normally one would have expected the Board to have addressed her. It won't be the first time an important issue has slipped through the cracks with the Board. But when they reversed his CAT eligibility, didn't that reverse hers, too? I would say if they had have been a little clearer, you know, the answer would be yes. And I think we could say a common-sense approach would be to say that her grant of CAT was entirely dependent on his, and therefore when his disappeared, hers also disappeared in their view, and they should have said it. But they didn't. I don't want to speculate as to what the Board would have done, but I would say that would probably be the only legally correct – the only legally correct option to them, since there really was – and we're not arguing that she had a record that would allow her to get a grant of CAT on her own, separate from what happened to her husband. Okay. Okay. Thank you. I'll hear from the government at this time. Good morning, Your Honor. May it please the Court. I'm Andrew McLaughlin. I represent the Respondent Attorney General of the United States in this case. This is actually a unique argument for me because I've never gone so far into the jurisdictional aspects that Judge Fletcher was talking about before, so I ask you to bear with me just for a moment. I'd like to cover the merits issues, which I think are actually fairly simple. Well, let's talk about this since it's top of our minds. Let's talk about the jurisdictional problems first. Okay. I anticipated that you'd be – I framed this in terms of what am I asking you to do, especially given the motion that I filed earlier. It is not – you said from the outset the government doesn't agree with the decision in Molina Camacho regarding the jurisdiction of the board to enter a – the jurisdiction of the board to enter a final order. That aside, the position of the government with respect to Molina Camacho is that in this case, it should either be limited or distinguished. Because Molina Camacho did not discuss the issue of what a removal order by an immigration judge is, that issue wasn't ever briefed. It didn't – it wasn't discussed in the decision. And in fact, it is discussed in the statute. The statute says when the – when an immigration judge enters a finding of removability or a – an explicit removal order – order – an order ordering a person removed, that is a removal order that becomes final upon the – upon the board's decision or upon the failure to – to appeal. So – But the board can't itself under the statute, it seems. That is the – that is the holding of this Court in Molina Camacho. Our – our position here is the – this Court doesn't need to reach that. This Court needs to say that Molina Camacho did not decide the issue of what a removal order by an immigration judge is. And under the statute, a finding of removability, like – as was made in this case, is a final – is a removal order. And therefore, when the judge – when the – when the board reversed the protection under CAP that the immigration judge granted, you reverted to that – to that removal order that had already been ordered by the immigration judge. Oh, well, why then did you ask us to remand? The reason I asked you to remand was because there were two ambiguities in this case. One is the issue that was highlighted by Petitioner, that – that the board is – was not particularly clear in reversing the CAP finding with respect to the second Petitioner. And the second was that – I thought that was just implicit, because she's – We find that it's – we think that it's implicit, too, and the person who briefed this case thought it was – thought it was implicit. But that, combined with the fact that Molina Camacho was decided after – after this and appeared to apply, it seemed like a reasonable thing to do, rather than spending our entire argument talking about something that neither party briefed, to get the case back in front of the board, get those things resolved, then get back in front of the court with the merits issue so we could discuss that fully. That was – that's – that's the only reason I made that argument. After I made that argument, and I had to do that fairly quickly once I got this case, what occurred to me is that there is, in fact, this – the rationale that we asserted in the rehearing petition in Molina Camacho, which subsequently became moved, that it – that the removal – the definition of removal order hadn't ever been discussed. So our position is, in this case, what you should find is that Molina Camacho doesn't apply because Molina Camacho didn't reach the issue of what is a removal order. The definition of a removal order is covered in the statute and is, under this case, would be one. The alternative that I proposed is, look, this really is a factual issue about whether or not, under immigration law and the facts of a particular case, that the immigration judge did or did not enter a removal order. And if you have a question about that, rather than do this – do what Molina Camacho did, which I know you wrote the decision in Molina Camacho's favor, but rather than send it to the district court, just send it back to the Board to clarify whether or not there was the rationale about whether or not there was a removal order by the immigration judge. Now, let's assume for the moment that we want to reverse. Does that make any difference in whether – in what we do in terms of – if you find that there's no final order of removal in this case, you don't have any jurisdiction and you can't reverse. So to reach the merits on this case, you have to find that there are final orders of removal. So my suggestion is you can do that. And if you – and if you – in the alternative, if you don't find that you have jurisdiction, you should find, in light of Lanza and other cases where these jurisdictional issues are fact-oriented, you should send it back to the court – to the Board to clarify in the first instance what their holding is with respect to whether or not there's a final order in light of Molina Camacho. Now, the – I point out that Molina Camacho was decided after this case was decided and after this case was briefed. Another timing issue that's also very relevant here, counsel was mentioning the new Board standards review of the IJA decisions. The IJA decision in this case was 1999. The Board's decision was 2003. The new standards of review for the review of the immigration judges weren't in place. They don't affect cases until September of 2003. They have to be appealed by 2003. So I point out that as a matter of timing, that's not in place. The other timing issue you pointed out is that he said that the Board was flaunting this Court's decision in Zheng by following SV. The Board decided this case two months before this Court decided Zheng. So Zheng wasn't in place. It used the same kinds of language that it used in the Zheng case that this Court subsequently disapproved of. So the question that you have to deal with on the merits is a different one. It's not whether the Board was flaunting it. It's whether under the circumstances of this case, you either need to remand as you did in Zheng, or you can say that, no, under the Zheng standard, the Board still made sufficient findings to uphold the cat denial under the Zheng standard. Shall I get to the merits now? Okay. On the issue of asylum, this is a pure substantial evidence case, and it's supported by the law squarely all the way around. The Board made two findings. One is that the only argument made was that there was a particular social group of businessmen who were harassed by somebody, loan sharks who may be related to narco, something along those lines. The Board said that's not a social group, and so did the immigration judge, and that is squarely in line with all of the law that exists. It's in line with this Court's holding in Hernandez Montiel, which cites the Board's holding with approval of the Board's holding in Acosta, which was a business social group case. So there is no social group involved in asylum, and as the Board pointed out, there's no evidence at all that the harm that he's asserting he was threatened with or whatever was associated with that, even if it were a social group. The fact is he got involved with loan sharks, and he's getting what he got. He personally is getting the consequences of that involvement. On the issue of CAT, substantial evidence, and the law, frankly, supports the Board's finding with respect to CAT. And the reason I say that is this. In order to demonstrate eligibility for CAT, and remember the burden is on the alien to demonstrate this eligibility for CAT, you have to demonstrate that there's a – it's more likely than not that you're going to be harmed first, that that harm – it's more likely than not that that harm is going to amount to torture. And in this case, we're talking about death and whether or not death and torture are – you know, that's a different issue. But for now, we'll accept that because the Board – It's all right to send him back for death, but not for torture. The torture convention – it is my position that death is not covered by the kind of excruciating pain stuff that's discussed in the torture convention. But that's – the Board didn't go there, so I don't need to go there. I think that's a very interesting argument. I don't think I'd go there either. Is that like the argument that Hoyle made in the Seventh Circuit that assassination wasn't persecution? I don't know if it's like that argument or not. What I'm saying is the definition of torture is defined in terms of – But you're dead. It's defined in terms of excruciating pain, and death doesn't necessarily involve excruciating pain. So that's a separate argument. That's not involved in this case. I don't think it's ever going to be a very good argument, counsel. There's a reason I don't raise it. Then the third part is the harm has to be either by the government or with government acquiescence. And even that has to be a more likely than not issue. And then you kind of multiply those three ratios together, and overall, you have to come out with a conclusion that the alien has proven more likely than not that all of those things are the case. I guess that the government applied – the BIA applied the wrong standard. Should we be sending it back for them to decide whether there was acquiescence? No, Your Honor. That's not necessary in this case. It's not necessary in this case for two reasons. One is the board clearly found that it is not more likely than not that this guy is going to get harmed at all by anybody for any reason. They clearly found that. That's an alternative finding. If there's not any harm, it doesn't make any difference whether the acquiescence business is applied. What's the wording in the BIA opinion that says that? We conclude that the lead respondent did not meet his burden of establishing that it is more likely than not that he would be in danger – subject to torture if returned to Columbia. Now, your opponent says that they can't really overturn the IJ's factual finding on that. That's absolutely not true. That's the reason I pointed out. But they have to have a reason. I mean, they just say that they didn't sustain the burden. I think from the analysis that they offer, and it's discussed – and if you read our brief, it's actually discussed where that exists. It's things like the fact that nothing bad happened to him, things like he doesn't actually know that anybody – that anything bad happened to, and he specifically said in his testimony he's not aware, he doesn't think that anybody is actually out there looking for him in Columbia or anywhere else at this time. What that adds up to is substantial evidence that supports that finding. Well, it would be nice if the Board would say that, wouldn't it? Your Honor, it is – in retrospect, it's always – you know, you can always say, oh, it would be nice if they covered a lot of different things. Let me mention for a moment, and I've only got a couple seconds left, I agree with you that the Board's finding covers the second petitioner because it was raised by the DHS covering both petitioners. The Board recognizes in its first paragraph that DHS is appealing regarding both petitioners. They specifically overturn the finding. They specifically sustain the appeal of the DHS. And then although they don't discuss in detail – you know, they don't specifically say, and we find this applies to the female petitioner, they go on to say, and by the way, having found that she's removable now, we don't grant her voluntary departure because she's not eligible. So that's another thing. I sure wish they would have said a couple more words about her, but it is implicit in their decision what the reasoning is. Are there any other questions? Roberts. Thank you for your argument. We'll give you a minute or two for a rebuttal, counsel. Kennedy. Just quickly, I still stand by my assertion that the Board never found that the lead petitioner would not be tortured. They found it wouldn't be by the government under the terms of Catt. And the little section of the sentence that counsel just read to you in which he said that he wouldn't, that they didn't – he didn't prove it's more likely than not he'd be in danger of being subjected to torture if returned to Columbia is followed by the phrase, either through the government taking an active role in the feared torture or because the government is unwilling to prevent such torture from occurring. And they say above, they repeat almost the same thing, that's at page 5 of the record, we do not agree that lead Respondent would be harmed by a person acting in an official capacity. So it's clear they're not. The evidence of potential torture is overwhelming based on the record. And I do agree with the Court that the real question is whether this Board's decision is supported by substantial evidence on the record. It is not. Based upon the record that was before the immigration judge, I submit that any reasonable trier of fact would be compelled to find, as he found. And there is simply no basis for reversing at this point. And that's – we submit on that, unless there is a last question. By seeing none, the case is argued with thanks to the Court for the argument, will be submitted for decision. We'll now proceed to Rosenbluth v. Prudential Securities.
judges: Lay , B. Fletcher, Hawkins